# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 21-735V
(to be published)

```
* * * * * * * * * * * * * * * * * * * * * * * *
                                    *
ELIZABETH BABO,                     *
                                    *
               Petitioner,          *
                                    *
        v.                          *
                                    *
SECRETARY OF HEALTH AND             *
HUMAN SERVICES,                     *
                                    *
               Respondent.          *
                                    *
* * * * * * * * * * * * * * * * * * * * * * * *
```

Chief Special Master Corcoran

Filed:  April 7, 2023

*Nicole M. Avitabile*, Law Offices of Jeffrey S. Glassman, LLC, Boston, MA, for Petitioner.

*Mark K. Hellie*, U.S. Department of Justice, Washington, DC, for Respondent.

## RULING ON ENTITLEMENT[1]

On January 13, 2021, Elizabeth Babo, formerly Elizabeth Moscone (hereinafter "Petitioner"), filed a petition for compensation under the National Vaccine Injury Compensation Program (the "Vaccine Program").[2] Petitioner alleges that she suffered a shoulder injury related

---

[1] This Decision will be posted on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 (2012). **This means the Decision will be available to anyone with access to the internet**. As provided by 42 U.S.C. § 300aa-12(d)(4)(B), however, the parties may object to the published Ruling's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen (14) days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the entire Decision will be available to the public in its current form. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755 (codified as amended at 42 U.S.C. §§ 300aa-10–34 (2012)) (hereinafter "Vaccine Act" or "the Act"). All subsequent references to sections of the Vaccine Act shall be to the pertinent subparagraph of 42 U.S.C. § 300aa.

to vaccine administration ("SIRVA") in her left shoulder as a result of a hepatitis A ("Hep A") vaccine administered to her on May 23, 2019.[3] Petition at 1 (ECF No. 1).

A dispute has arisen between the parties as to whether Petitioner can satisfy the elements of a Table SIRVA claim. For the reasons discussed below, I find that Petitioner can.

## I.   Relevant Procedural History

As noted above, this case was initiated in January 2021 and was originally assigned to a different special master before being reassigned to me in August 2021. It began as a *pro se* matter, but Petitioner obtained counsel in June 2021.

Petitioner filed medical records with the Statement of Completion filed on October 29, 2021. (ECF No. 26). Beginning in December 2021, the parties engaged in settlement discussions, but reached an impasse by March 2022. (ECF No. 36). Thereafter, Respondent offered his Rule 4(c) Report contesting entitlement in May 2022. (ECF No. 37). On May 9, 2022, I issued an order directing Petitioner to file a brief addressing the issue of onset. *See* non-PDF Order, dated May 9, 2022. Petitioner's Brief Addressing Onset Issue was filed on October 6, 2022. Brief, dated Oct. 6, 2022. (ECF No. 42) ("Br."). Respondent filed his Response on November 17, 2022. Response, dated Nov. 17, 2022. (ECF No. 44) ("Resp."). The claim is now ripe for resolution.

## II.   Findings of Fact Regarding Onset

### A.   Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

---

[3] Although Respondent notes that the Petition does not specify which shoulder Petitioner claims was injured, the vaccine administration record states that Petitioner received the Hep A vaccine in her left deltoid. Pet. at 1, ¶¶ 1–3; Ex. 1.

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at \*20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, at \*19. And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions. *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203–04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at \*5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] … did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare not only the medical records and testimony, but also all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational). And although later oral testimony that conflicts with medical

records is less reliable as a general matter, it is appropriate for a special master to credit a petitioner's lay testimony where it does not conflict with the contemporaneous records. *Kirby*, 997 F.3d at 1382–84.

## B. Analysis

I have fully reviewed the evidence, including all medical records and affidavits, Respondent's Rule 4(c) Report, and the parties' briefs. I find most relevant the following:

- Upon receiving the subject vaccination, Petitioner was twenty-three years old. Her prior medical history was non-contributory.

- On May 23, 2019, Petitioner received the hepatitis A ("Hep A") vaccine in her left deltoid at a local urgent care facility in Stoneham, Massachusetts. Ex. 1 at 2.

- The next medical record is dated approximately eight months later, from January 15, 2020, when Petitioner presented to her primary care provider ("PCP"), Dr. Yuriy Andrusyshyn, complaining of left arm pain "right below the deltoid area," and noting that it started "after she had a hepatitis [A] vaccination at urgent care." Ex. 7 at 21. Upon examination, Dr. Andrusyshyn noted that the left extremity was "tender on palpation in anterior side right under deltoid muscle with no restriction of movement." *Id*. at 22. Dr. Andrusyshyn recommended that Petitioner use NSAIDS, alternate warm and cold compresses, and return in two weeks if there was no improvement or the pain continued to worsen. *Id*.

- Two weeks later, on January 28, 2020, Petitioner saw Dr. Laurie Gumuchian, for a follow-up visit, complaining of ongoing left arm pain. Ex. 7 at 16. Petitioner reported receiving the Hep A vaccine as part of her application for the FBI and that since then she has experienced pain in her left shoulder area. *Id*. Upon examination, Petitioner had pain but exhibited full range of motion in her left shoulder, weakness of biceps and triceps in her left arm, and she was "slightly hyperreflexic on left at biceps and brachioradialis." *Id*. at 19. Dr. Gumuchian referred Petitioner to an orthopedist for further evaluation and testing *Id*. at 20.

- The next day, Petitioner saw orthopedist, Dr. Joseph Czarnecki, for a consultation at Excel Orthopedic Specialist. Ex. 3 at 13. Petitioner reported that her symptoms began around May 2019, and that she "was getting a vaccination at the time[,] which caused increased pain in her shoulder." *Id*. During examination, Dr. Czarnecki documented Petitioner's full range of motion in her left shoulder, with pain, and noted her mildly reduced (4/5) strength when compared to her right shoulder (5/5). *Id*. at 14. Petitioner underwent an X-ray which revealed "[l]eft shoulder type 2 acromion" but was otherwise negative. *Id*. Dr. Czarnecki administered a lidocaine injection and further recommended Petitioner take NSAIDS and consider physical therapy ("PT") to address her left shoulder pain. *Id*. at 13–14.

4

- Petitioner returned to Dr. Czarnecki on September 24, 2020, for a follow-up visit where she reported some improvement, but that the pain had not completely resolved. Ex. 3 at 11. Petitioner's exam remained unchanged; however, it was noted that her strength had improved on external rotation (5/5). *Id*. at 12. To fully evaluate Petitioner's shoulder, Dr. Czarnecki ordered an MRI, which was performed on September 30, 2020. *Id*.

- On October 5, 2020, Petitioner returned to Dr. Czarnecki to discuss her MRI results, but was informed they were unremarkable. Ex. 3 at 8–9. Dr. Czarnecki administered a second lidocaine injection into Petitioner's left shoulder and further advised Petitioner to return if the pain did not resolve. *Id*. at 9.

- On February 23, 2021, Petitioner saw her PCP for an annual exam. Ex. 2 at 3. During the visit, she reported that she had been applying to the FBI, but due to her persistent shoulder pain, she was unable to complete her training. *Id*. Petitioner reported that her left shoulder "start[ed] to [feel] sore again" after receiving the second lidocaine injection in October 2020. *Id*. at 2–9.

- On March 8, 2021, Petitioner visited Dr. Czarnecki and reported that while the second lidocaine injection had "completely resolved" her shoulder pain, she noticed the pain had been progressively worsening and that the pain was "worse than it ever has been"— rating her pain as 10/10. Ex. 3 at 5. Upon examination, Petitioner exhibited reduced range of motion but full strength in her rotator cuff. *Id*. at 6. Dr. Czarnecki recommended that Petitioner undergo a left shoulder arthroscopy. *Id*.

- On April 20, 2021, Petitioner underwent arthroscopic surgery on her left shoulder, which included labral debridement and subacromial decompression. Ex. 4 at 9–10. Eight days later, on April 28, 2023, Petitioner started her post-operative PT and completed a total of twenty-five sessions through July 2021. Ex. 6 at 6–60. At discharge, Petitioner exhibited improved range of motion, strength, and function in her left shoulder. *Id*. at 6. At this time, Petitioner had met all of her functional goals and had returned to work. *Id*.

- Petitioner has submitted an affidavit in support of her petition. Petitioner explains therein that in 2019 she was employed as a nurse and was often required to lift and move patients. Ex. 10 at ¶ 5. Prior to her vaccine administration, she had never experienced any difficulty lifting and moving patients. *Id*. at ¶ 7. Petitioner avers that since receiving the Hep A vaccine, she has not only experienced pain and discomfort when lifting and moving patients, but that she had needed to ask co-workers for help when doing these tasks. *Id*. at ¶¶ 8–9.

- Petitioner submitted an affidavit from her mother, Mariann Moscone. Ex. 11. She averred that Petitioner lived with her in 2019 and 2020 and that Petitioner began experiencing left shoulder pain immediately after her vaccine administration in May

2019. *Id*. at ¶¶ 3–4. She told Petitioner that it was likely the "normal pain a person experiences after vaccination." *Id*. at ¶ 6. She stated that Petitioner continued to complain about her left arm pain and that she was unable to sleep on her left side because of the pain. *Id*. at ¶¶ 8, 10. She stated that Petitioner requested her help with completing daily tasks. *Id*. at ¶ 11. She encouraged Petitioner to seek medical treatment in January 2020 after Petitioner dropped out of the Massachusetts State Police Academy due to the increasing pain. *Id*. at ¶¶ 14, 16.

- Petitioner submitted an affidavit from her co-worker, Kristie McNall. Ex. 12. She averred that prior to May 2019, she had seen Petitioner lift and move patients without any pain in her left shoulder. *Id*. at ¶ 5. After May 2019, she noticed that Petitioner was experiencing left shoulder pain when lifting and assisting patients. *Id*. at ¶ 8. She stated that Petitioner asked her for help in lifting and moving patients. *Id*. at ¶ 9.

- Petitioner submitted an affidavit from her husband, Alexander Babo. Ex. 13. He averred that he and his wife had been living together for approximately one year. *Id*. at ¶ 4. He stated that following Petitioner's vaccine administration, she complained of pain and discomfort in her left arm. *Id*. at ¶ 7. He noted that he received a text message from Petitioner on or about May 28, 2019, detailing her pain and discomfort in her left shoulder. *Id*. at ¶ 9. He stated that he received similar text messages from Petitioner in June 2019, all of which discussed the pain and discomfort she continued to have in her left shoulder. *Id*. at ¶¶ 12–14; *see also* Ex. 14. He stated that Petitioner continued to complain about her left shoulder pain and that she was unable to sleep on her left side because of it. *Id*. at ¶ 16. He recalled receiving a text message from Petitioner in January 2020, asking if he would accompany her to an urgent care facility to get an X-ray of her left arm. *Id*. at ¶ 17.

Respondent emphasizes that Petitioner did not seek treatment for more than eight months after vaccination, suggesting it casts doubt on a finding that onset occurred consistent with the Table requirement. While claimants often delay treatment for SIRVA injuries, unsure of whether their symptoms will be transitory, a delay of this length is uncommon, and thus raises reasonable questions.

At the same time, however, Petitioner did not seek treatment for any other medical condition or illness during this eight-month period. Such intervening treatment evidence can in many cases either corroborate a petitioner's claim or undermine it; it is absent here. In addition, when Petitioner first reported shoulder pain, she related it to her May 2019 Hep A vaccine. Ex. 7 at 21. When she first consulted an orthopedist, Petitioner again reported that she had started experiencing pain around May 2019 and that at the time she was getting a vaccination. Ex. 3 at 13. Once Petitioner sought treatment, she thereafter consistently reported left shoulder pain and identified the date of onset as May 2019 after receiving a Hep A vaccine. And these records predate the filing of this action, and thus cannot be deemed to be the product of awareness of the elements of the SIRVA claim.

I also find Petitioner's explanation for her delay to be reasonable and credible. *See, e.g.*, *Stevens v. Sec'y of Health & Hum. Servs.*, No. 90-221, 1990 WL 608693, at *3 (Fed. Cl. Spec. Mstr. 1990) (noting that clear, cogent, and consistent testimony can overcome missing or contradictory medical records). Petitioner, who was a nurse, has established that she was monitoring her own symptoms throughout the non-treatment period, believing that they would go away with time. Br. at 6. It was not until Petitioner could "no longer stand the pain" that she decided to seek medical treatment. *Id*. Petitioner's affidavit testimony, and that of her mother, husband, and co-work are consistent with her statements recorded by her medical providers.

For the foregoing reasons, Petitioner has established that she suffered the onset of shoulder pain within 48 hours after vaccination.

## III.   Other Requirements for Table SIRVA

Because I have determined the onset of her left shoulder pain occurred immediately upon vaccination, Petitioner has met the timing required for a Table SIRVA, fulfilling the second of the four Table Criteria. *See* 42 C.F.R. § 100.3(a)(XIII)(A) (Table entry for SIRVA following Hep A vaccine); 42 C.F.R. § 100.3(c)(10)(ii) (second QAI requirement). But there are three additional requirements. 42 C.F.R. § 100.3(c)(10)(i) (iii-iv). Specifically, the record in this case contains no indication that Petitioner suffered prior left-shoulder issues. *See* 42 C.F.R. § 100.3(c)(10)(i). There is no evidence of any other condition or abnormality that represents an alternative cause. 42 C.F.R. § 100.3(c)(3)(10)(iii). The medical records and affidavits support that her shoulder pain and reduced range of motion were limited to the left shoulder. 42 C.F.R. § 100.3(c)(3)(10)(iv). The contemporaneous vaccination record reflects the site of administration as her left deltoid. Ex. 1; Sections 11(c)(1)(A) and (B)(i).  Petitioner has not pursued a civil action or other compensation. Pet. at 2; Section 11(c)(1)(E). Finally, Petitioner suffered the residual effects for more than six months after vaccination. Thus, Petitioner has satisfied all requirements for entitlement under the Vaccine Act.

(I do take note of the treatment gap, however. In light of it, Petitioner must calibrate any demand for pain and suffering to take into account the fact that she was able to bear her injury for such a long period of time without treatment).

## CONCLUSION

Based on the entire record, I find that Petitioner has provided preponderant evidence satisfying all requirements for a Table SIRVA. Petitioner is entitled to compensation. A subsequent order will set further proceedings towards resolving damages.

**IT IS SO ORDERED.**

<u>/s/ Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master